Samsung Electronics Co., Ltd. We will hear on the cross appeal. You, Mr. Modi. Thank you, your Honors. Good afternoon. May it please the court. Starting with ProMass' appeal, Claim 1 broadly resides providing a mask without any limitation as to the material for the mask. Commensurate with the breadth of Claim 1, Samsung's combination relied on a hard mask structure, again, without any limitation as to the material. So what ProMass does on appeal, and I tried to do this before the Board as well, it twists Samsung's combination and says, well, it's limited to a particular hard mask material. But the Board correctly rejected that and found as a factual matter that a person of ordinary skill would have had the requisite skill set to select an appropriate mask material and other materials such as an etching gas. This court should simply affirm. So if we dig deeper into this analysis and look at the evidence that we have, again, this is a substantial evidence issue. The Board is entitled to a lot of deference on this issue. Why was relying on NultiMask a problem? Sure, your Honor, I can jump to that. It was not a problem for three reasons, your Honor. First, it was directly responsive to the arguments ProMass made in its patent owner response. Second, and which I think is the more important reason, again, if you look at the petition, nowhere did we limit the petition to just a silicon nitride hard mask material. The petition broadly recited the whole structure. And in fact, in the institution decision, the Board correctly read our petition as not being so limited, right? It actually pointed to the hard mask material in Ho and said that other materials can be used for the structure. So Samsung was entitled to rebut that and support that in its reply, which is exactly what it did. So again, if you look at the... And this is an abuse of discretion issue from the Board, and the Board is certainly entitled to deference on that issue. But Nulti was relied on, though, to say that there are other types of materials separate and apart from the one identified in Ho, right? So Nulti was just supporting the Board's conclusion based on just Ho, right? If you look at Ho, Ho specifically tells us... And maybe we can look at Ho just to make sure that the record is clear. So if we look at Ho... Appendix 523. Judge O'Malley, let me know when you're there. I'm there. Okay, so if you go to Appendix 523, it's column 3, and it's lines 15 through 19. It says, a hard mask layer 12 is deposited over second organosilicate layer 14, completing the example in the wafer stack. And then it says, hard mask may be formed of silicon oxide, silicon nitride, or other hard mask materials, especially in organic hard mask materials. And we think that's fatal to their argument because, again, Ho itself recognizes that it's not limiting its structure to just a silicon nitride material. So what the Board did in its decision when it relied on the reply evidence is completely proper under this court's case law in Genzyme, for example, Belden. So here we do believe the Board properly looked at the evidence. But even if you were to exclude Nulti, and Nulti is hardly even mentioned in the Board's decision, we believe Ho by itself gets us there. So then if we look at the evidence, they point to one of the motivations to combine that the Board relied upon. It's the critical dimension limitation. But there was more motivation to combine here. And specifically, if you look at, for example... The petition, there were three reasons that we gave for the combination here. One was that you want a robust mask because the Fujimoto process, there are two contact openings you're trying to open, and one of them is deep. So you want a robust mask. That was supported by the testimony of Dr. Rubloff. Second, we said Ho's mask structure would provide the additional benefit of preventing undesirable standing. And then third, we pointed to the critical dimension issue that they raised. But I think there's an important point there. We were comparing the use of a hard mask to a photoresist, and we said one of scale would have understood that using a hard mask would have improved critical dimensions. And if you look at the expert testimony, testimony from their own expert, Mr. Brumbaugh, at Appendix 1741, for example, he agreed that the hard mask does provide additional advantages as opposed to a photo mask, and would not have necessarily impacted the critical dimensions. So there's plenty of evidence in the record to support the board's fact-finding on a motivation to combine. With respect to, and there's more with respect to the whole issue of whether one of scale would have not used, that Ho was incompatible because of the etchant that it uses, the fluoride etchant. Again, if you look at Ho itself, it says a problem may exist, not that it always exists. And I think what's fatal to the argument here on appeal is we have not heard a response either before the board or here to the Ho's statement that it actually says in certain instances you want to use a fluorine-based gas. And that's in Appendix, for example, 526, column 9. So, again, there's plenty of evidence in the record to support the board's fact-findings on why a fluorine-based etchant would be compatible, would have been compatible with the mask structure. And then the board also made a finding that, in fact, Fujimoto is not limited to a fluorine-based gas. And that's at, for example, Appendix 33. Again, that further supports the board's decision with respect to this issue. So, collectively, the board here carefully considered the party's evidence and the arguments. They weighed the testimony. They credited Samsung's testimony over and over again, over Mr. Brambutt's testimony. This court should simply affirm with respect to Samsung's appeal. Unless you have any other questions on that, or PROMAS's appeal, I should say. Unless you have any other questions, I'd like to move on to the cross-appeal. Okay. So, with respect to the cross-appeal, it's, in our view, a very simple issue. It's limited to Claim 5. Claim 5 recites that the etching method is a dry-etch method. PROMAS does not dispute. It didn't dispute this before the board or this court. There are only two options for etching in this process. It's either a wet-etch or a dry-etch. PROMAS admitted before the board that there are, in fact, advantages to using a wet-etch. It has numerous benefits. What's more, we have the 044 patent. It does not provide any unexpected results with respect to using a wet-etch or a dry-etch. So, given these circumstances, the board should have found Claim 5 obvious as a matter of law. And if you look at, for example, some of the cases that we believe lead to that result, the ones that I would point to, for example, Personal Web, we believe very squarely fits this case where there were only a limited number of options, and here we only have two. So, this is per se obvious. And I think you have to look at this in the context of what's happening here. So, if you look at Claim 1, the board found that claim obvious, right, in light of Fujimoto and Ho. So, what they do is, in Claim 5, they say, well, the etch is a dry-etch, and in Claim 6, they say the etch is a wet-etch. So, in effect, what the board said was that Claim 5 would be allowable even though it's such a fundamental feature in semiconductor processing and there are only two options. Well, the board did concede that there were only two options, but I think what the board found lacking in your expert's testimony was that there's a specific, they call it circumstances, but a specific environment that Fujimoto is discussing, and the board found lacking the fact that a wet-etch would ever be appropriate for the Fujimoto environment. Why isn't that supported by the record? So, sure, let me address that. By the absence of evidence in the record. Sure, let me address that. So, if we look at what the evidence showed, so, obviously, Fujimoto is the primary reference. We relied on the Patterson reference, and I think we should maybe take a look at that. So, if you go to the Patterson reference and if you could go to Appendix 534. That's the reference that the board specifically said was dependent upon the material of the dialectic. Right, so I want to unpack that for you, Your Honor, if I could. I feel like I'm watching CNN. So, if we go to the Patterson reference, Your Honor, and if we go to Appendix 534, and if you look at, starting with Column 3, and we're now looking at line, for example, 62. It said, Multilevel 16 may be a conventional dielectric material used for insulation of polysilicon layers from overlying metallization. And then it goes on and says, an example of a conventional multilevel dielectric is phosphorus-doped silicon dioxide. There's no dispute here that that's a oxide layer, just like Fujimoto, right? So, then that's the material that Patterson's etching. So, then you go to Column 4, and if you go to line 5, again, same on Appendix 534, it says, Contact 18, VI 18, is patterned according to conventional photolithographic techniques and etched by conventional wet or plasma etches for the particular material of Multilevel 16. So, what Patterson is telling us is that to etch an oxide layer, you can use a wet etch or a dry etch. So, the concerns that there is before the Board, which we submit the Board actually did not resolve. But if you go and look at their arguments, and if I could have you now turn to Appendix 529, the figures of the Fujimoto reference. So, their response to this evidence was, before the Board, again, the Board did not resolve this, they said, well, Fujimoto would somehow, there would be a beer barrel effect, is the argument they made. But if you actually look at figures 2B and 2C, you can see that there's a VI 18 in that figure, there is no beer barrel effect. It's a vertical opening, just like in Fujimoto. So, the Board's concerns that it had with respect to Fujimoto, when it's implemented with the technique of Patterson, it simply is not supported by the evidence. Can you address something that the Board did not cite in the carryover paragraph on 55 to 56, which is the two-and-a-half pages of prominence's expert, Baumwatt, starting at 1357 to 1359, which seems to take issue with the applicability of etching for Fujimoto. I sure can, Your Honor. And I think the response is simple. If you actually look at that testimony, what Mr. Brumbutt says is, he looks at a particular passage in Fujimoto, and I think we should look at that. Passage or is this a figure 1D? Right, and then I think the passage that he refers to in Fujimoto is in column 5, where he says, well, in Fujimoto, and it's appendix 498, Your Honor. And you'll see on this page, appendix 498, it talks about right in the middle on column 5, right along line 30 to about 35, Fujimoto talks about avoiding a beer barrel effect. So what Mr. Brumbutt did here is, he said, well, look, Fujimoto tells you, because it's using a wet etch or it's using a dry etch, that you would actually avoid the beer barrel effect. But if you actually read this passage, this refers to the etching rate, which would be applicable to a dry etch or a wet etch. So his testimony certainly is just not, it's not supported by what he's saying. And like you pointed out, Your Honor, the board didn't resolve it. And I think you have to go back to the legal argument here. Given that the 044 patent, there's only one sentence in the 044 patent with respect to this etch, right? Well, I guess my question is, whether there are missing factual findings on this Claim 5, for which a remand would be appropriate. Not what you want, which is an outright reversal on the theory that this is one of those binary design options so obviously available that under certain portions of KSR, the inquiry can stop there. And the board kind of went with you up to that last paragraph and then said, but we don't think this is one of those cases, maybe because of the particular environment. And yet we don't have a discussion of the evidence on that of exactly the sort that you are now giving. So Your Honor, you're absolutely right. At a minimum, we think a remand is warranted. And we believe under this court's case law, again, if you look at the 044 patent, there's one sentence on whether using a wet etch or a dry etch in its process. And why is that? Because it was so well known. There are only two options. This is exactly like the Personal Web case. They have not shown that there are unexpected properties. So we do believe that this court can find, as a matter of law, that Claim 5 is obvious, given the circumstances there. But at a minimum, I believe you're right, Judge Toronto, this should go back to the board for those factual findings. Unless Your Honors have any other questions, I will save the rest of the time. I will save your rebuttal time. Thank you. Let's hear from Mr. Kauffman. I'm sorry, can I ask a question? Another question? Delaware, Claim 5. So, Your Honor, it's my understanding the case hasn't gotten that far. Because it matters, possibly, for standing. I understand, Your Honor. But the case hasn't gotten that far. Thank you. Okay. May it please the Court. The board got it exactly right with respect to Claim 5. They found that the evidence presented by Samsung was inadequate to establish that a person skilled in the art would use the wet edge in Fujimoto's process,   by Samsung was inadequate to establish and explain the problems with the wet edge and didn't suggest any solution. I think they read the law too broadly when they suggest that any time there are two alternatives as a matter of law, it must be obvious. I think the context is important. And I think that the Supreme Court and this Court have said that you have to consider all the facts in the context and not just apply sort of a rubber stamp test. And I think here where Fujimoto in Column 5 warns about the beer barrel, and Mr. Modi was talking about etching rates, and part of that is the difference between the way wet etching works, which Mr. Brombach described as isotropic. So it kind of eats away everything in every direction, versus the dry etchings, which are anisotropic. And so you have, it will etch down faster than it will etch sideways. And so that's why you don't get the beer barrel effect, but rather you just, it's kind of like drilling a hole instead of, I'm trying to think of a good analogy where you pour water into something and it would partially dissolve out into a, if you had a sugar base. The Court didn't actually say that though, right? I mean, it pretty much just said, we just don't think there was enough evidence that you would use it in Fujimoto's format, right? Right, because of the problems of Fujimoto. The Board did not go into anisotropy versus isotropy. The Board did not make findings on that. But the Board said in the context of Fujimoto, where they're trying to avoid the beer barrel, that Samsung had not met its burden. And one of the points Samsung raised in its briefing is that the Board somehow committed some sort of error by not considering our footnote about the, at page 1370 of the appendix, about the advantages, such as they are, of wet etching process. But if we look at that, that statement says the benefit of a wet etch is that it is higher throughput, less complex, and lower cost, even though it cannot achieve anisotropy. That's the statement that Samsung was arguing that the Board improperly ignored, but the Board referenced it and didn't find that it changed the analysis, that Samsung's trying to make the term although do a lot of work in that context. With respect to Judge Taranto's second-to-last question, I think, actually, about whether this case needs to go back down for remand, we would submit no. We think the factual findings are adequate here and support the Board's decision and that the Board's decision can be affirmed and there need be no remand with respect to Claim 5. Unless there are any questions on the cross-appeal, I think I have one point to make on our primary appeal, and then I'll cede the balance of my time. Thank you. Turning back to the original appeal, Nulty was cited by Dr. Rubloff, Samsung's expert, in the reply declaration as providing a teaching of polysilicon as a potential hard mask, and the Board relied on that as part of its finding that the claim was obvious. So the idea that Nulty was somehow harmless, I think, is inappropriate, and also that the use of a later articulated reference in theory is not appropriate under Wasika and Cambridge file. And with that, Your Honor, thank you for your time. Mr. Nulty, you have a couple of minutes on the cross-appeal. I know, Your Honor, we're running late, so I will be quick. With respect to this whole point on Fujimoto, I just want to give the Court one more citation on Appendix 496. When Fujimoto talks about the beer barrel effect, it is directed to the etching rate, which would apply to a wet etch or a dry etch. Does a wet etch always etch one material faster than another? So again, Your Honor, I think it depends on a number of factors, and it could, for example, the thickness of the material could matter. But what we have in the record is, that's in Appendix 1307, they said benefit of a wet etch is that it's higher throughput, less complex, and lower cost. So there's certainly benefits to a wet etch. And again, we only have two options here, wet etch and a dry etch. The cases like Persil-Webb and this Court's case, the Google versus Phillips case from January, we think squarely fit this fact pattern. And just one last point, I just want to make sure I may have misspoken earlier. Claim 5 is the dry etch claim. Claim 5 is a wet etch claim. That's what we're talking about here. Claim 6 is the dry etch claim that was found to be invalid by the Board. So again, if this Court were to let PROMAS get away with Claim 5, we think, just from a policy perspective, that it would not be fair, because they would have Claim 1 is invalid, Claim 6 is invalid. The only claim that survives is a well-known feature in semiconductor processing, that you have a wet etch in this process. So, unless your Honors have any other questions, we ask this Court to reverse for this point. Okay, thank you. Thank you both. Thank you. The case is submitted. And that concludes this panel's argued cases for this session. All rise. The Honorable Court is adjourned until tomorrow morning. It's at o'clock a.m.